STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

17-563

APRIL FERGUSON, ET AL.

VERSUS

PROGRESSIVE ACUTE CARE AVOYELLES, LLC, ET AL.

**\*\*\*\*\*\*\*\*\*\***

ON APPLICATION FOR SUPERVISORY WRITS FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2016-3243
HONORABLE KERRY L. SPRUILL, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**SHANNON J. GREMILLION**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, Shannon J. Gremillion, and John E. Conery,
Judges.

**WRIT GRANTED AND MADE PEREMPTORY.**

Nicholas Gachassin, III
Holly McKay Descant
Gachassin Law Firm LLC
P.O. Box 80369
Lafayette, LA 70598
(337) 235-4576
**COUNSEL FOR DEFENDANT/RELATOR:**
Dr. Christopher Ritter

Mark A. Jeansonne
Attorney at Law
P.O. Box 301
Hessmer, LA 71341
(318) 563-9000
**COUNSEL FOR PLAINTIFFS:**
April Ferguson
April Furguson on behalf of Avery Ferguson
April Ferguson on behalf of Sidney Ferguson

Chad P. Guillot
Attorney at Law
P.O. Drawer 158
Marksville, LA 71351
318-253-6656
**COUNSEL FOR PLAINTIFFS:**
April Ferguson
April Furguson on behalf of Avery Ferguson
April Ferguson on behalf of Sidney Ferguson

**GREMILLION, Judge.**

Defendant, Dr. Christopher L. Ritter, seeks supervisory writs from the trial court's denial of his motion for summary judgment. For the following reasons, we grant the writ and render summary judgment in favor of Dr. Ritter.

### FACTUAL AND PROCEDURAL BACKGROUND

This medical malpractice suit arises from the treatment provided to Joseph Ferguson (Ferguson) by Dr. Ritter, an emergency room (ER) physician, on June 29, 2014, when Ferguson presented at the Avoyelles Hospital ER complaining of weakness and pain in his right lower extremity and a history of diabetes, morbid obesity, and chronic low back pain. Based upon the patient's complaints, Dr. Ritter believed Ferguson either had a blood clot, diabetic neuropathy, or back radiculopathy. Dr. Ritter suggested Ferguson have a venous ultrasound or CT scan of his right leg to rule out a blood clot. However, this could not be done at the Avoyelles Hospital because of the patient's size, nearly 600 pounds. Dr. Ritter then called Rapides Regional in Alexandria and Our Lady of Lourdes in Lafayette, but neither hospital could accommodate the patient and refused to transfer. As he did not feel the ultrasound was immediately necessary, Dr. Ritter advised Ferguson to see his primary care provider the next day to arrange for an ultrasound, and, with the diagnosis of diabetic neuropathy, discharged the patient, who, according to the nursing records, was able to walk without pain at discharge.

On June 30, 2014, Ferguson presented at the Rapides Regional ER with similar complaints and was again discharged with instructions to follow up with his primary care physician. After a fall at home, Ferguson returned to the Rapides Regional ER on July 6, 2014, with pain in his right ankle and was discharged with instructions given for ankle sprain. Through her own initiative, Ferguson's wife,

April Ferguson (plaintiff), contacted the Cardiovascular Institute in Lafayette on July 17, 2014, and was referred to Our Lady of the Lake in Baton Rouge, which could accommodate her husband's size. Ferguson then went to the Our Lady of the Lake ER on July 19, 2014—19 days after his visit with Dr. Ritter—with complaints of worsening leg weakness, a fall two weeks prior, a broken ankle, and new onset right arm weakness that had begun two days prior. A CT scan of Ferguson's head performed at Our Lady of the Lake found three separate but adjacent hyperdense and enhancing brain masses. Ferguson eventually died from these brain tumors nine months later on April 24, 2015.

On December 15, 2014, plaintiffs filed a request for medical review panel (MRP), which rendered a unanimous opinion finding that "[t]he evidence does not support the conclusion that [Dr. Ritter] failed to meet with the appropriate standard of care as charged in the complaint." On July 5, 2016, plaintiff, individually and on behalf of Ferguson's children, Avery and Sidney Ferguson, filed the instant suit against Dr. Ritter and other defendants, alleging a lost chance of survival and related damages due to an incorrect diagnosis of diabetic neuropathy.

On October 19, 2016, Dr. Ritter filed a motion for summary judgment on the ground that plaintiffs did not have an expert to establish breach of the standard of care. In support, Dr. Ritter filed a copy of the MRP opinion and reasons, as well as the petition and answer thereto. The hearing was originally set for December 5, 2016. After plaintiffs faxed their opposition to the court and Dr. Ritter's counsel on December 4, 2016, the trial court allowed the opposition, deferred ruling on the motion, re-set the hearing for February 17, 2017, and ordered that "Plaintiffs obtain an expert and provide an expert report or affidavit, if any they can, 15 days prior the hearing." No expert report was produced prior to the hearing. Instead,

2

plaintiffs filed a motion for extension of time, at the hearing of which plaintiffs filed their opposition to Dr. Ritter's motion for summary judgment. Therein, plaintiffs argued that an expert was not necessary because the negligence was so obvious given that Ferguson's wife, a layperson with a fifth grade education, was able to find a hospital in one of the three cities capable of providing top quality medical care—Shreveport, New Orleans, and Baton Rouge—that could accommodate Ferguson's size, with just a simple phone call. At the conclusion of that hearing, the trial court, very conscious of plaintiffs' indigent status, granted the extension to produce an expert until April 17, 2017. The summary judgment hearing was again re-set to April 28, 2017.

After hearing arguments and taking the matter under advisement, the trial court denied Dr. Ritter's motion, reasoning:

> The record reflects that [Dr. Ritter] suspected that Mr. Ferguson may have been suffering from diabetic neuropathy or potential blood clots. [Dr. Ritter] recommended an ultrasound of Mr. Ferguson's leg, but due to his size, was unable to accommodate him at Avoyelles Hospital where Mr. Ferguson sought treatment. After calling two hospitals in the area, both of which could not accommodate Mr. Ferguson's size, [Dr. Ritter] diagnosed Mr. Ferguson with diabetic neuropathy, and released him from care. This Court considered not only the potentially deadly nature of blood clots, but also that during the 19-day lapse between Mr. Ferguson's release from the visit with [Dr. Ritter] and when his wife ultimately scheduled an ultrasound of his leg at a Baton Rouge hospital, Mr. Ferguson suffered a fall which broke his ankle.

> The defendant argues that the plaintiffs cannot meet the element of establishing causation, as there is no causal connection between [Dr. Ritter]'s failure to transfer Mr. Ferguson for an ultrasound of his leg, and the subsequent cause of his death—three brain tumors referred to as glioblastoma. However, the record reflects that Mr. Ferguson's brain tumors were discovered on the same day that he received an ultrasound of his leg at a Baton Rouge hospital, supporting plaintiffs' argument that, had Mr. Ferguson been properly assessed, it is more likely than not that a correct diagnosis would have been made sooner rather than later. This fact (i.e. that the diagnosis of brain tumors was made during the same hospital stay as the ultrasound of Mr. Ferguson's leg) undermines defendant's argument that plaintiff

3

cannot prove a causal connection between the delay in treatment and Mr. Ferguson's resulting injuries. Once the flawed diagnosis of diabetic neuropathy was excluded by the Baton Rouge hospital, the correct diagnosis for brain tumors was immediately determined.

Genuine issues of material fact exist as to whether this 19-day delay in Mr. Ferguson's diagnosis and subsequent treatment lowered his chances of survival. Furthermore, the issue of damages Mr. Ferguson suffered, which may or may not have resulted from [Dr. Ritter]'s failure to secure the appropriate tests, remain a question of fact for the jury. Under the facts presented at bar, is inquiry at two facilities sufficient to meet the standard of care to absolve the defendant doctor of liability? Or, is more required? Again, these are questions for resolution by a jury.

. . . Because no expert is required as a matter of law, this Court finds that summary judgment is not appropriate. A genuine issue of material fact exists as to whether a 19-day delay in Mr. Ferguson's diagnosis and subsequent treatment may or may not have significantly contributed to his suffering, caused him further injury, and lowered his chances of survival. This Court finds that dismissing the claims of a widow and her two young children, depriving them of their day in court, is a particularly harsh remedy at this stage of the litigation, given the disputed facts that remain in question.

Dr. Ritter now seeks review of the trial court's judgment.

## SUPERVISORY RELIEF

A court of appeal has plenary power to exercise supervisory jurisdiction over trial courts and may do so at any time, according to the discretion of the court. When the trial court's ruling is arguably incorrect, a reversal will terminate the litigation, and there is no dispute of fact to be resolved, judicial efficiency and fundamental fairness to the litigants dictate that the merits of the application for supervisory writs should be decided in an attempt to avoid the waste of time and expense of a possibly useless future trial on the merits. *Herlitz Const. Co., Inc. v. Hotel Investors of New Iberia, Inc.*, 396 So.2d 878 (La.1981) (per curiam). This "supervisory jurisdiction may also be exercised to reverse a trial court's denial of a motion for summary judgment and to enter summary judgment in favor of the mover." *Csaszar v. Nat'l Cas. Co.*, 14-1273 (La.App. 3 Cir. 11/14/15), 177 So.3d

807, 809. Nevertheless, appellate courts generally will not exercise their supervisory jurisdiction when an adequate remedy exists by appeal. *Douglass v. Alton Ochsner Med. Found.*, 96-2825 (La. 6/13/97), 695 So.2d 953.

## ON THE MERITS

Appellate courts review motions for summary judgment de novo, using the identical criteria that govern the trial court's consideration of whether summary judgment is appropriate. *Samaha v. Rau*, 07-1726 (La. 2/26/08), 977 So.2d 880. The reviewing court, therefore, is tasked with determining whether "the motion, memorandum, and supporting documents show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law." La.Code Civ.P. art. 966(A)(3).

Initially, the burden of producing evidence at the motion hearing is on the mover, "who can ordinarily meet that burden by submitting affidavits or by pointing out the lack of factual support for an essential element in the opponent's case." *Schultz v. Guoth*, 10-343, p. 6 (La. 1/19/11), 57 So.3d 1002, 1006. If it is determined that the moving party has met its burden, the burden then shifts to "the adverse party to produce factual support sufficient to establish the existence of a genuine issue of material fact or that the mover is not entitled to judgment as a matter of law." La.Code Civ.P. art. 966(D)(1).

> At that point, the party who bears the burden of persuasion at trial (usually the plaintiff) must come forth with evidence (affidavits or discovery responses) which demonstrates he or she will be able to meet the burden at trial. Once the motion for summary judgment has been properly supported by the moving party, the failure of the non-moving party to produce evidence of a material factual dispute mandates the granting of the motion.

*Samaha*, 977 So.3d at 883 (quoting *Wright v. La. Power & Light*, 06-1181, p. 16 (La. 3/9/07), 951 So.2d 1058, 1069-70).

5

To establish a claim for medical malpractice, a plaintiff must prove, by a preponderance of the evidence:

> (1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
>
> (2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.
>
> (3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

La.R.S. 9:2794(A). Expert testimony is generally required to establish the applicable standard of care, breach of the applicable standard, and causal link between the injury and the breach. *Samaha*, 977 So.2d 880. The only recognized exception is where the negligence is so obvious that a layperson can infer negligence without the guidance of expert testimony. *Pfiffner v. Correa*, 94-924, 94-963, 94-992 (La. 10/17/94), 643 So.2d 1228. The supreme court has held, however, that a causal nexus between delayed treatment and a patient's death is not obvious and requires expert testimony, either from plaintiff's experts or defendant's experts, to establish that the health care provider breached the applicable standard of care and that this breach caused the patient's death or loss of a chance of survival. *Id*.

Dr. Ritter asserts the trial court erred in ruling that an expert was not necessary given the complex medical issues presented in this case, which are beyond the province of a layperson to assess without the aid of expert testimony.

6

He notes that a lay jury will need to determine the significance of the location of the brain tumors, the size of the brain tumors, and interpret medical terms like "frontoparietal lobe," "central necrosis," "right parietal lobe," "falx," "multicentric glioma," "mass effect," and "midline shift." Moreover, the jury will be called upon to answer such questions as (1) would an ultrasound of the leg have revealed the same findings as the CT scan of the head; (2) were the brain tumors treatable on June 29, 2014; and (3) would treatment of those brain tumors have extended Ferguson's life beyond April 24, 2015? Without expert testimony, Dr. Ritter argues that plaintiffs cannot show that Ferguson would have discovered his brain tumors earlier or fared any better had Dr. Ritter done an ultrasound of the patient's leg. And even if Dr. Ritter was able to testify to the expert standard of care at trial as plaintiffs argued below, plaintiffs have not produced expert evidence to counter the uncontradicted expert opinion of the MRP that there was no breach.

To succeed on her claim, Dr. Ritter points out that plaintiffs needs to establish, either through their own experts or the testimony of the defendants or defense experts, that, given Ferguson's medical history and conditions, as well as Dr. Ritter's clinical and diagnostic findings, that Dr. Ritter breached a specific standard of care and that this breach caused Ferguson's loss of a chance of survival. At the hearing, plaintiffs' attorney even acknowledged an expert regarding causation was necessary. Simply put, the evidence submitted by Dr. Ritter establishes a prima facie case that he did not breach the applicable standard of care in his treatment of the patient and that there was no causal connection between the alleged breach and Ferguson's death. In the absence of any countervailing evidence from plaintiffs, Dr. Ritter is entitled to summary judgment.

Regarding the trial court's written reasons, Dr. Ritter challenges what he refers to as the trial court's gross misstatements of fact, explaining that: (1) the record does not reflect that Ferguson had an ultrasound done at the Baton Rouge Hospital; (2) Ferguson presented at that hospital with new symptoms that indicated the need for a CT scan of the head; (3) there was no indication for a CT scan of the head when Dr. Ritter saw the patient; (4) it was the CT scan of the head that diagnosed the brain tumors, which ultimately led to Ferguson's demise; (5) an ultrasound of the leg would not have diagnosed the tumors; and (6) the trial court was not presented with any records regarding "intense pain" or administration of "appropriate pain medication."

In this matter, we are presented with the issue of whether the trial court erred in denying summary judgment after Dr. Ritter presented prima facie proof, in the form of the MRP opinion, that he did not breach the applicable standard of care, and plaintiffs then failed to produce an expert, or any evidence, to contradict that expert medical evidence. We find the trial court erred in summarily concluding that expert testimony is not needed to establish either breach of the standard of care or causation.

This is not a case of obvious negligence, which would not require expert testimony to prove the elements of plaintiffs' malpractice claim. Whether Dr. Ritter breached the applicable standard of care and whether that breach caused injury will turn on complex medical issues and terms that are not within the experience or lexicon of an average layperson. Because the issues are beyond the province of a layperson to assess without the aid of expert testimony, the parties, to either succeed on or survive summary judgment, have to produce such evidence.

8

Through the uncontradicted medical evidence contained in the MRP opinion and reasons, Dr. Ritter arguably supported his position that plaintiffs cannot prove an essential element for their medical malpractice claim—breach of the standard of care. Upon this prima facie showing, the burden then shifted to plaintiffs to "produce evidence from a medical expert to establish a breach of the standard of care" sufficient to show the existence of a genuine issue of material fact or that Dr. Ritter was not entitled to judgment as a matter of law. *Shultz*, 57 So.3d at 1009. Plaintiffs produced no evidence whatsoever. Accordingly, Dr. Ritter is entitled to summary judgment, and plaintiffs' claims against Dr. Ritter are dismissed. All costs of this appeal are assessed to the plaintiffs, April Ferguson, April Ferguson on behalf of Avery Ferguson, and April Ferguson on behalf of Sidney Ferguson.

**WRIT GRANTED AND MADE PEREMPTORY**.